```
                                        FILED
                                CLERK, U.S. DISTRICT COURT

                                    DEC 1 2 2008

                                CENTRAL DISTRICT OF CALIFORNIA
                                BY                     DEPUTY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOLENE MARIE HEACOCK,               )    NO. EDCV 08-996-CT
                                    )
            Plaintiff,              )    OPINION AND ORDER
                                    )
        v.                          )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of                     )
Social Security,                    )
                                    )
            Defendant.              )
                                    )
_____)

        For the reasons set forth below, it is ordered that the matter be
**REMANDED** pursuant to sentence four of 42 U.S.C. Section 405(g) to
defendant Commissioner of Social Security (the "Commissioner") for
further administrative action consistent with this order.

                        SUMMARY OF PROCEEDINGS

        On July 30, 2008, plaintiff, Jolene Marie Heacock ("plaintiff"),
filed a complaint seeking judicial review of the denial of benefits by
the Commissioner pursuant to the Social Security Act ("the Act").  On
November 11, 2008, plaintiff filed a brief with points and authorities
in support of remand or reversal.  On December 10, 2008, the
Commissioner filed a brief in opposition.

1  SUMMARY OF ADMINISTRATIVE RECORD

2  1.   Proceedings

3       On November 25, 2005, plaintiff filed applications for a period of
4  disability and disability insurance benefits and Supplemental Security
5  Income ("SSI") benefits, alleging disability since August 13, 2005 due
6  to clogged arteries, heart condition, and stroke.  (TR 94-113). [1]  The
7  applications were denied initially and upon reconsideration.  (TR 54-63,
8  65-69).

9       Plaintiff filed a request for a hearing before an administrative
10  law judge ("ALJ"), and on March 26, 2008, plaintiff, represented by an
11  attorney, appeared and testified before an ALJ.  (TR 24-53).  The ALJ
12  also considered vocational expert ("VE") and medical expert ("ME")
13  testimony.  On April 22, 2008, the ALJ issued a decision that plaintiff
14  was not disabled, as defined by the Act, and therefore not eligible for
15  benefits, because she could perform a limited range of light work and,
16  given that residual functional capacity ("RFC"), there are jobs that
17  exist in significant numbers in the economy that plaintiff can perform.
18  (TR 8-19).  On June 21, 2008, plaintiff's request for review of the
19  ALJ's decision was denied by the Social Security Appeals Council.  (TR
20  1-3).  Accordingly, the ALJ's decision stands as the final decision of
21  the Commissioner.  Plaintiff subsequently sought judicial review in this
22  court.

23  2.   Summary Of The Evidence

24       The ALJ's decision is attached as an exhibit to this opinion and

25  _____

26      [1]    "TR" refers to the transcript of the record of
    administrative proceedings in this case and will be followed by
27  the relevant page number(s) of the transcript.

28
2

order and, except as otherwise noted, materially summarizes the evidence in the case.

PLAINTIFF'S CONTENTIONS

Plaintiff contends as follows:

1.   The ALJ failed to properly consider the opinion of the consultative examiner;

2.   The ALJ improperly determined that plaintiff could perform the jobs of bench assembler and office helper;

3.   The ALJ failed to consider the treating psychologist's opinion regarding plaintiff's functional status;

4.   The ALJ failed to consider the type, dosage, effectiveness and side effects of plaintiff's medications; and

5.   The ALJ failed to properly consider the lay witness testimony.

STANDARD OF REVIEW

Under 42 U.S.C. §405(g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971), but less than a preponderance. Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner.  Flaten v. Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995).  The court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for

3

rehearing." 42 U.S.C. §405(g). Remand is appropriate where additional proceedings would remedy defects in the Commissioner's decision. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

DISCUSSION

1.   The Sequential Evaluation

A person is "disabled" for the purpose of receiving social security benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

The Commissioner has established a five-step sequential evaluation for determining whether a person is disabled. First, it is determined whether the person is engaged in "substantial gainful activity." If so, benefits are denied.

Second, if the person is not so engaged, it is determined whether the person has a medically severe impairment or combination of impairments. If the person does not have a severe impairment or combination of impairments, benefits are denied.

Third, if the person has a severe impairment, it is determined whether the impairment meets or equals one of a number of "listed impairments." If the impairment meets or equals a "listed impairment," the person is conclusively presumed to be disabled.

Fourth, if the impairment does not meet or equal a "listed impairment," it is determined whether the impairment prevents the person from performing past relevant work. If the person can perform past relevant work, benefits are denied.

4

1  Fifth, if the person cannot perform past relevant work, the burden

2  shifts to the Commissioner to show that the person is able to perform

3  other kinds of work.   The person is entitled to benefits only if the

4  person is unable to perform other work.  20 C.F.R. §§404.1520, 416.920;

5  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

6  2.   Issues

7       A.   Consultative Examiner's Opinion (Issue 1)

8       Plaintiff contends that the ALJ failed to properly consider the

9  opinion of Dr. Robert A. Moore, who conducted a neurological examination

10  of plaintiff on February 13, 2006.

11      The opinion of an examining physician is entitled to greater weight

12  than that of a non-examining physician. Lester v. Chater, 81 F.3d 821,

13  830 (9th Cir. 1996).   The Commissioner must present "clear and

14  convincing" reasons for rejecting the uncontroverted opinion of an

15  examining physician and may reject the controverted opinion of an

16  examining physician only for "specific and legitimate reasons that are

17  supported by substantial evidence." Id. at 830-31; see also Widmark v.

18  Barnhart, 454 F.3d 1063, 1068-69 (9th Cir. 2006).

19      Here, Dr. Moore's neurological examination resulted in essentially

20  normal findings.  (TR 207-08).  He found that plaintiff was "cognitively

21  intact" and could perform simple and complex tasks.  (TR 208).  However,

22  based on plaintiff's reported episodes of temporarily losing vision in

23  the right eye and shaking of the left extremities in August of 2005, Dr.

24  Moore opined that she could not climb, balance, work at heights, work

25  around moving machinery, operate a motor vehicle or use power tools.

26  (TR 209).

27      The ALJ considered Dr. Moore's findings and opinions and discussed

28

5

them in his decision.  (TR 15-16).  However, the ALJ adopted the more restrictive functional capacity assessment of the medical expert, Dr. Landau, who reviewed plaintiff's medical records and testified at the hearing.  Like Dr. Moore, Dr. Landau included seizure-related restrictions in his RFC assessment of plaintiff.  (TR 30).

The ALJ found that a "possible seizure disorder" was one of plaintiff's severe impairments, (TR 12), and included the same seizure-related restrictions given by Dr. Landau:

> The usual seizure precautions apply.  The [plaintiff] can climb stairs but cannot climb ladders, ropes, or scaffolds. She cannot work at heights, balance, operate motorized equipment or work around dangerous, moving machinery.

(TR 12).

As plaintiff points out, however, the ALJ did not include Dr. Moore's specific limitation on operating a motor vehicle, which is different that a restriction on operating motorized equipment.  There is no explanation for why this restriction was omitted and no discussion of such a restriction by Dr. Landau.  Given these circumstances, the failure to include the consultative examiner's restriction on driving, without explanation, was error.[2]

The error was material.  One of the jobs that the ALJ found that plaintiff could perform, the "office helper" job, potentially requires the employee to drive.  See Dictionary of Occupational Titles ("DOT"), Job No. 239.567.010, which can be found on Westlaw at 1991 WL 672232

---

[2]The fact that plaintiff occasionally drives is irrelevant. A person with a seizure disorder may be physically able to drive until they have a seizure.

1  (G.P.O.).  Although the VE testified that plaintiff could perform only

2  a subset of the officer helper jobs available, (TR 51), because the

3  hypothetical posed by the ALJ to the VE did not include a driving

4  restriction, it is impossible to tell whether the office helper jobs

5  that the VE found plaintiff could perform include jobs that require

6  driving.

7       Accordingly, remand is warranted on this issue.

8       B.   Step 5 Determination (Issue 2)

9       Plaintiff contends that the ALJ erred in determining that she can

10  perform the bench assembler job listed in the DOT as Job No. 706.684-042

11  and the office helper job, which is listed as DOT Job No. 239.567-010.

12       "The DOT 'is not the sole source of admissible information

13  concerning jobs.'"  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir.

14  1995), quoting Barker v. Shalala, 40 F.3d 789, 795 (6th Cir.1994).

15  "'The Secretary may take administrative notice of any reliable job

16  information, including ... the services of a vocational expert.'"  Id.,

17  quoting Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir.1991).

18       "Introduction of evidence of the characteristics of specific jobs

19  available in the local area through the testimony of a vocational expert

20  is appropriate, even though the job traits may vary from the way the job

21  title is classified in the DOT."  Id.  Thus, "an ALJ may rely on expert

22  testimony which contradicts the DOT, but only insofar as the record

23  contains persuasive evidence to support the deviation."  Id.

24       Further, the ALJ has an affirmative duty to inquire whether the

25  VE's testimony conflicts with the DOT.  Massachi v. Astrue, 486 F.3d

26  1149, 1152 (9th Cir. 2007).  This requirement is to "ensure that the

27  record is clear as to why an ALJ relied on a vocational expert's

28

testimony, particularly in cases where the expert's testimony conflicts with the [DOT]." Id. at 1153. "Thus, the ALJ must first determine whether a conflict exists. If it does, the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT." Id.

Here, the ALJ concluded that plaintiff has the following residual functional capacity:

> [Plaintiff] can lift and/or carry 10 pounds frequently and 20 pounds occasionally. Out of an 8-hour period, she can stand and/or walk for 2 hours and sit for 6 hours with normal breaks every 2 hours. [Plaintiff] has to get up slowly from a seated position. She would miss work once, sometimes twice a month. The usual seizure precautions apply. [Plaintiff] can climb stairs but cannot climb ladders, ropes, or scaffolds. She cannot work at heights, balance, operate motorized equipment or work around dangerous, moving machinery. Mentally, due to alleged confusion and memory problems, [plaintiff] can perform simple, repetitive, low stress jobs requiring less than occasional contact with the public as well as interpersonal contact with co-workers and supervisors.

(TR 12, see also TR 50).

The VE testified that, given this RFC, plaintiff could perform a subset of bench assembler and office helper jobs. (TR 50-51). The bench assembler job requires, among other things, the employee to "assemble[] parts to form yard and garden care equipment components, such as reels, steering handles, and gear boxes, following specifications and using handtools and power tools." DOT No. 706.684-042, 1991 WL 679055 (G.P.O.). The power tools used include a pneumatic impact wrench, power press, pneumatic clinching gun and a rivet press. (Id.)

The office helper job description provides that the employee "may deliver items to other business establishments" and "may specialize in

delivering mail" between departments or "within and between stock brokerage offices."   DOT No. 239.567.010, 1991 WL 672232 (G.P.O.).

The VE testified that, given plaintiff's assessed limitations, she could perform "some work as a bench assembler" and that "eroding by 75 percent would leave 750 [jobs] regionally and in excess of 10,000 nationally."  (TR 50).  When asked if her testimony was consistent with the Dictionary of Occupational Titles, the VE responded "yes," without further explanation or elaboration.  (TR 51).  However, as noted above, the bench assembler job requires working with power tools, which may have potentially dangerous moving parts.   Accordingly, the bench assembler job appears to be inconsistent plaintiff's RFC and the VE failed to provide support or any explanation for her testimony that plaintiff could perform even a quarter of the bench assembler jobs available.  Cf. Johnson v. Shalala, 60 F.3d at 1435 (ALJ properly relied on VE testimony which deviated from the DOT where "there was persuasive testimony of available job categories in the local rather than the national market, and testimony matching the specific requirements of a designated occupation with the specific abilities and limitations of the [plaintiff].").

The VE also testified that plaintiff could perform office helper jobs, although the job base would have to be eroded by 50 percent to accommodate plaintiff's limitations.  (TR 51).  However, as discussed above, the ALJ's assessed RFC, and the RFC contained in the ALJ's hypothetical to the VE, did not contain a restriction on driving.  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006)(holding that hypothetical to a VE based on an incomplete set of limitations is legally inadequate and the VE's responses have no evidentiary value).

9

1    Accordingly, remand is warranted on issue two as well.

2    C.   <u>Treating Psychologist's Opinion</u> (Issue 3)

3    Plaintiff also contends that the ALJ erred in failing to consider
4    the opinion of plaintiff's treating psychologist, N.T. Webber, Ph.D.

5    "The ALJ may disregard the treating physician's opinion whether or
6    not that opinion is contradicted." <u>Andrews v. Shalala</u>, 53 F.3d 1035,
7    1041 (9th Cir. 1995)(citation omitted ).   However, to reject the
8    uncontroverted opinion of plaintiff's physician, the ALJ must present
9    clear and convincing reasons for doing so.   <u>Id</u>.   If the treating
10   physician's opinion is contradicted by other doctors, the Commissioner
11   may not reject the opinion without providing "specific and legitimate
12   reasons" for doing so that are supported by substantial evidence.
13   <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (citation
14   omitted).   "'The ALJ can meet this burden by setting out a detailed and
15   thorough summary of the facts and conflicting clinical evidence, stating
16   [his] interpretation thereof, and making findings.'" <u>Tommasetti v.</u>
17   <u>Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008), quoting <u>Magallanes v.</u>
18   <u>Bowen</u>, 881 F.2d 747, 751 (9th Cir.1989).

19   Here, plaintiff was briefly hospitalized from September 29, 2005 to
20   October 3, 2005.   She was diagnosed with a single episode of major
21   depression with psychosis, amphetamine abuse and alcohol abuse.   (TR
22   167).   Hospital records noted that she had no previous psychiatric
23   hospitalizations, although she had received treatment for depression.
24   (TR 167).

25   After her hospitalization, plaintiff went to the San Bernardino
26   County Department of Behavioral Health on October 12, 2005.   An intake
27   evaluation was performed and it was signed by a clinician and Dr.

28

Webber.   The diagnosis was major depression with psychotic features, with a notation to rule out bipolar disorder, as well as "amphetamine dependance – early full remission." (TR 196). The notation on Axis V, which indicates plaintiff's assessed Global Assessment of Functioning ("GAF"), is "42/42."[3]   (Id.) A GAF score of 42 indicates either serious symptoms or a serious impairment in social, occupational or school functioning.   See DSM IV-TR at 34.

Plaintiff contends that the ALJ erred by failing to mention Dr. Webber's opinion regarding plaintiff's functional status as reflected in the GAF score he gave plaintiff on October 12, 2005. However, although the ALJ did not specifically mention the GAF score, he did specifically discuss and consider Dr. Webber's diagnosis and findings and noted, correctly, that "[t]he record is devoid of any further treatment from this facility." (TR 16). Moreover, although plaintiff contends that the notation "42/42" means that plaintiff was assessed as having a "past year/current year" functional level of 42, there is no support for plaintiff's contention.   In fact, according to plaintiff's own allegations, she did not become disabled until August of 2005, only two months before Dr. Webber's assessment.[4]

_____

[3]American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (2000) ("DSM IV-TR"), p. 34.  The GAF score is composed of two components, symptom severity and functioning.  Where the two components are discordant, for example, where symptoms are severe, but functioning is better, the final GAF rating always reflects the worst of the two.  See DSM IV-TR at 32-33.

[4]Plaintiff testified that she was not seeing a psychiatrist or psychologist at the time of the hearing and that she did not have any psychological problems that kept her from working.  (TR 28, 51).

11

The ALJ found that plaintiff had depression, which was a severe impairment, and limited her to simple, repetitive tasks in low stress jobs requiring less than occasional contact with the public as well as interpersonal contact with coworkers and supervisors. (TR 12). The ALJ's assessment is consistent with the limitations assessed by the state agency physician, (TR 212-28), the findings of the consultive psychiatric examiner in January 2006, (TR 201-205), and with plaintiff's record of psychiatric treatment. See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"). Further, the ALJ's assessment is not inconsistent with a single GAF assessment by Dr. Webber based on plaintiff's isolated evaluation on October 12, 2005.

The ALJ did not materially err in considering Dr. Webber's opinions and remand is not warranted on this issue.

D.   Side Effects of Plaintiff's Medications (Issue 4)

Plaintiff argues that the ALJ failed to properly consider the type, dosage, effectiveness and side effects of plaintiff's medications.

An ALJ must consider all factors that might have a significant impact on an individual's ability to work, including the side effects of medication. Erickson v. Shalala, 9 F.3d 813, 817-18 (9th Cir. 1993). When a plaintiff testifies about experiencing a known side effect associated with a particular medication, the ALJ may disregard the testimony only if he "support[s] that decision with specific findings similar to those required for excess pain testimony." Varney v. Sec'y of Health and Human Servs., 846 F.2d 581, 585 (9th Cir. 1988), *relief*

12

1    *modified*, 859 F.2d 1396 (9th Cir. 1988).  However, side effects not

2    "severe enough to affect [plaintiff's] ability to work" are properly

3    excluded from consideration.  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1164

4    (9th Cir. 2001).

5         Although plaintiff stated in her disability report that she

6    experiences drowsiness from taking Clonazepam (TR 144), she did not

7    testify that side effects from Clonazepam significantly impacted her

8    functioning or ability to work.  (TR 28).  Plaintiff does not cite to

9    any complaints made to plaintiff's doctors about side effects of that

10   medication.

11        Remand is not warranted on this issue.

12        E.    <u>Plaintiff's Sister's Testimony</u> (Issue 5)

13        Plaintiff contends that the ALJ failed to consider in his decision

14   the testimony of plaintiff's sister.

15        "[D]escriptions by friends and family members in a position to

16   observe [plaintiff's] symptoms and daily activities have routinely been

17   treated as competent evidence."  <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1232

18   (9th Cir. 1987).  Accordingly, competent lay testimony "as to a

19   [plaintiff's] symptoms or how an impairment affects ability to work is

20   competent evidence . . . and therefore cannot be disregarded without

21   comment."  <u>Stout v. Commissioner of Soc. Security Admin.</u>, 454 F.3d 1050,

22   1053 (9th Cir. 2006)(citations omitted).  Rather, "[i]f the ALJ wishes

23   to discount the testimony of the lay witness, he must give reasons that

24   are germane to each witness for doing so."  <u>Id</u>. (citations omitted).

25        The ALJ gave several reasons for discounting the unsworn statements

26   of plaintiff's sister, including that her statements as to the extent of

27   plaintiff's limitations were not consistent with the medical evidence.

28

This is an appropriate basis for discounting the statements of plaintiff's sister. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)(inconsistency with the medical evidence is a proper reason for discounting the credibility of lay testimony)

Remand is not warranted on this issue.

### REMAND IS APPROPRIATE IN THIS CASE

The decision whether to remand a case for additional evidence is within the discretion of the court. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). Remand is appropriate if the record is incomplete and additional proceedings would remedy defects in the Commissioner's decision. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

Having considered the record as a whole, it appears that the present record is insufficiently developed.

### CONCLUSION

Accordingly, it is ordered that the matter be **REMANDED** pursuant to sentence four of 42 U.S.C. §405(g) to the Commissioner for further administrative action consistent with this opinion.

DATED: 12/12/08

CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

MAY-01-2008  16:11        SSA MORENO VALLEY CA              19516562241    P.005

### SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

#### DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability, Disability Insurance |
| Jolene Marie Heacock | Benefits, and Supplemental Security Income |
| (Claimant) | |
| | ▇▇▇▇▇▇▇▇▇ |
| (Wage Earner) | (Social Security Number) |

#### JURISDICTION AND PROCEDURAL HISTORY

On November 25, 2005, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on November 25, 2005. In both applications, the claimant alleged disability beginning August 13, 2005. The claims were denied initially and upon reconsideration on January 25, 2007. Thereafter, the claimant filed a timely written request for hearing on March 19, 2007 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). The claimant appeared and testified at a hearing held on March 26, 2008, in San Bernardino, CA. Also appearing and testifying were: Samuel Landau, M.D. and an impartial medical expert; and Sandra M. Fioretti, an impartial vocational expert. The claimant is represented by Dan Keenan, an attorney.

#### ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2010. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from August 13, 2005 through the date of this decision.

See Next Page



8

Jolene Marie Heacock ███████                                    Page 2 of 12

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

See Next Page

9

MAY-01-2008  16:11          SSA MORENO VALLEY CA                    19516562241        P.007

Jolene Marie Heacock ███████████                              Page 3 of 12

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, she is not disabled. If the claimant is not able to do other work and meets the duration requirement, she is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

2. **The claimant has not engaged in substantial gainful activity since August 13, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**

3. **The claimant has the following severe impairments: history of transient ischemic attacks (TIA) and stroke in August 2005, which was treated successfully with LICA endarterectomy; obesity; a possible seizure disorder; an organic mental disorder; and a depressive disorder.**

The above impairments more than minimally limit the claimant's ability to perform basic work activities.

The claimant has hypertension, but the record shows that it is controlled (Exhibit 10F, p. 14) and there is no indication that this condition is "severe" or has caused any end organ damage or other significant problems.

See Next Page

10

Jolene Marie Heacock ███████████                                    Page 4 of 12

The claimant has glaucoma, but I do not find this to be a "severe" impairment. She was evaluated for glaucoma in February 2006 due to high intraocular pressures (Exhibit 3F). Visual fields were normal and intraocular pressure was 22/18/17/24 in the right eye and 22/21/23/23 in the left. Best corrected visual acuity was 20/20 in right eye and 20/25 in left. She takes no medication for glaucoma (Exhibit 5F).

In the record, the claimant complained of headaches. CAT scans of the head were interpreted as normal vs. a small right frontal lobe infarct (Exhibit 1F, pages 16 and 17). There is no evidence that the headaches are "severe," chronic and unrelenting, and she testified that they are relieved by hot showers. There is no reason to conclude that the headaches would preclude the performance of substantial gainful activity within the assessed residual functional capacity.

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

This finding is supported by the opinion of the medical expert and the State Agency physicians, all of whom considered the relevant Listings.

The claimant's mental impairment does not meet or medically equal the criteria of listing 12.02 or 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

I agree with the State Agency review psychiatrists who concluded that with regard to the Part B criteria, the claimant would have mild difficulty in activities of daily living and moderate difficulty maintaining social functioning and concentration, persistence, and pace. There are no repeated episodes of decompensation each of extended duration (Exhibit 7F). As set forth in Social Security Ruling 96-6p, State Agency consultants are highly qualified physicians who are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f), and in the evaluation of the medical issues in disability claims under the Act. As members of the teams that make determinations of disability at the initial and reconsideration levels of the administrative review process (except in disability hearings), they consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, the existence and severity of an individual's impairment(s), the existence and severity of an individual's symptoms, whether the individual's impairment(s) meets or is equivalent in severity to the requirements for any impairment listed in 20 CFR part 404, subpart P, appendix 1 (the Listing of Impairments), and the individual's residual functional capacity (RFC).

Jolene Marie Heacock ████████████                                    Page 5 of 12

In activities of daily living, the claimant has mild restriction. The claimant is able to do household chores (Exhibit 5F, p. 2). She testified that she makes dinner and cares for the house. Despite her alleged seizures, she drives.

In social functioning, the claimant has moderate difficulties. The claimant alleges social anxiety (e.g. feeling people are looking at her (Exhibit 4F).

With regard to concentration, persistence or pace, the claimant has moderate difficulties. At the psychological consultative examination (Exhibit 4F), the claimant was experiencing mild to moderate difficulties with concentration, persistence, and pace.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.
The limitations identified in the "paragraph B" and "paragraph C" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Accordingly, the undersigned has translated the above "B" and "C" criteria findings into work-related functions in the residual functional capacity assessment below.

**5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a narrowed range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, she can lift and/or carry 10 pounds frequently and 20 pounds occasionally. Out of an 8-hour period, she can stand and/or walk for 2 hours and sit for 6 hours with normal breaks every 2 hours. The claimant has to get up slowly from a seated position. She would miss work once, sometimes twice a month. The usual seizure precautions apply. The claimant can climb stairs but cannot climb ladders, ropes, or scaffolds. She cannot work at heights, balance, operate motorized equipment or work around dangerous, moving machinery. Mentally, due to alleged confusion and memory problems, the claimant can perform simple, repetitive, low stress jobs requiring less than occasional contact with the public as well as interpersonal contact with co-workers and supervisors.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p

MAY-01-2008  16:12        SSA MORENO VALLEY CA                    19516562241      P.010

Jolene Marie Heacock                               Page 6 of 12

and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that she quit working due to transient ischemic attacks (TIA's) and strokes that began in August 2005. She has these TIA's a couple of times a month, lasting a minute or two. What also prevents her from working are headaches and neck pain, which developed in the last one and a half years and are not due to any specific trauma or injury. She has been given medications for the headaches, but she had a hard time functioning on medications so she just takes hot showers, which work for her. She also alleged numbing, tingling, weakness, and a lack of coordination of the left upper extremity. The claimant testified that sometimes she has visual disturbance, about once a week, if she gets up too fast.    She also alleged memory and concentration problems. The claimant testified that she can lift 10 pounds and did not know if she could lift 20 pounds. She can sit for 2 hours at a time for a total of 6 out of 8 hours. She can stand for 1 hour out of an 8-hour period.   She lies down if her neck hurts really bad. She takes a couple of showers a day for pain. She testified that though she sleeps well, she wakes up at night and feels tired all the time.   The claimant lives with her boyfriend who works from 5 a.m. to 5 p.m. She makes dinner and cares for the house. Despite her alleged seizures, she drives. The claimant has a history of substance abuse, but testified she has not abused drugs or alcohol since August 2005 and there is no evidence to the contrary.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements and those of her sister at Exhibit 5E concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below. In addition, despite her alleged seizures, the claimant drives and sometimes baby-sits her grandchildren, indicating her children must trust that she will not have a seizure while the children are in her care. As noted by the State Agency (Exhibit 8F, p. 4), the claimant does have a history of intermittent vision loss from a "mini-stroke." However, her best corrected visual acuity is 20/20 in the right eye and 20/25 in the left and visual fields are normal (Exhibit 3F). The claimant's cardiac condition is said to be stable (Exhibit 13F, p. 27). Although she complains of depression, she testified that she does not see a psychiatrist. The claimant alleged

See Next Page

13

Jolene Marie Heacock ███████████

she has difficulty with memory and concentration; yet, she told the neurologist that she felt her thinking and memory were fine (Exhibit 5F, p. 1). Psychological testing revealed only mild cognitive impairments and at the hearing she had no significant problem with her memory and did not appear confused.   While the claimant's substance abuse is in remission, she told the neurologist that she had no history of drug or alcohol use (Exhibit 5F, p. 2), which is untrue and contradicted by other reports (Exhibits 1F and 2F).  If the claimant was not truthful in certain aspects of her claim, then it is reasonable to conclude that she may not have been truthful in her testimony and exaggerated her pain and symptoms.  At any rate, this lack of candor does diminish her credibility.

I have read and considered the statements from the claimant's sister at Exhibit 5E, but I find these statements are only credible to the extent that the claimant can do the work described herein.  The statements made by the sister have not been given under oath.  The sister is not a medical professional and as a lay witness she is not competent to make a diagnosis or argue the severity of the claimant's symptoms in relationship to her ability to work.  At the time the report was completed, the claimant was living in the sister's house and the sister had a financial interest in seeing the claimant receive benefits.  Therefore her opinion is not an unbiased one.  Most importantly, her statements are not supported by the clinical or diagnostic medical evidence that is discussed more thoroughly below.

In terms of the claimant's TIA's and stroke, she was hospitalized in August 2005 for treatment of right sided temporary ischemic attacks (TIA's) manifested by right amaurosis fugax (temporary loss of vision), left-sided weakness, and anxiety.  Medical workup found a totally occluded right internal carotid artery and 95% stenosis of the left internal carotid artery (Exhibit 1F, p. 12).  A left carotid endarterectomy was done on August 31, 2005.  CAT scans of the head were interpreted as normal vs. a small right frontal lobe infarct (Exhibit 1F, pages 16 and 17).  Echocardiogram was normal with ejection fraction of 60 to 65%.  She reported that with a combination of Lexapro, Klonopin, and Depakote, she no longer had symptoms of TIA (Exhibit 1F, p. 3). The claimant went to the emergency room on January 13, 2006 complaining of chest pain and shortness of breath.  After workup, myocardial infarction was ruled out (Exhibit 10F, p. 39) and she was discharged in stable condition. On February 21, 2007, an ultrasound showed complete occlusion of the right internal carotid artery with no significant stenosis of the left internal carotid artery (Exhibit 13F, p. 11).  Surgery was indicated (Exhibit 13F, p. 18). In June 2007, she complained of neuropathy in the left upper extremity (Exhibit 13F, p. 16). However, neurological examination was normal (Exhibit 13F, p. 16), the symptoms were said not to appear to be TIA and cardiac markers were negative (Exhibit 13F, p. 16).

The claimant underwent a neurological consultative examination on February 13, 2006 (Exhibit 5F).  She continued to complain of impaired vision in the right eye with no complaints in the left.  She was taking no medication for glaucoma.  She also reported that she was told she had a seizure disorder. She reported that her memory and thinking were fine.  The mental status portion of the examination found the claimant alert and oriented to person, place and time. She recalled three out of three objects after five minutes and distraction. She was able to perform simple calculations. She was able to follow three-step commands and repeat three reversed digits. No apraxias or agnosias were noted. The claimant's fund of knowledge for recent and remote events appeared appropriate for her educational level. Speech was normal. There was no

Jolene Marie Heacock ▇▇▇▇▇▇

difficulty in naming objects. She spoke in grammatically correct sentences. She was able to read and write without difficulty. On physical examination, gait was normal. There was normal tone in the upper and lower extremities. No fasciculation or atrophy was noted. Upper and lower extremity strength was 5/5 and symmetrical. Using the Jamar dynamometer, grip strength was 60/60/55 pounds of force with the right hand and 45/55/55 with the left hand. There were no sensory deficits. Reflexes were 1/4. The examiner diagnosed a history of cerebrovascular disease with a history of right ischemic optic neuritis and possible simple partial seizures. The examiner noted that the claimant was cognitively intact and was of the opinion that she could follow simple and complex commands and perform simple and complex tasks. The examiner noted that he did not have access to the claimant's medical records and could not determine whether the seizures represented TIA's, simple partial seizures or nonepileptiform phenomena. In any event, the claimant had not had these episodes for several months on her current medication regimen. However, because of these episodes, the claimant could not climb, balance, work at heights, work around moving machinery or operate a motor vehicle. She cannot use power tools. According to the examiner, the neurological examination was nonfocal, and the claimant has full abilities to stand, sit, walk, bend, stoop, lift and carry. She can sit in an unrestricted manner and has full unrestricted use of the upper extremities.

The claimant has a possible seizure disorder; however, these appear to occur infrequently per the neurological consultative examiner (Exhibit 5F). This is supported by clinic notes from McKee Clinic (Exhibit 9F) that show the claimant has a history of a seizure disorder. However, on April 3, 2006, she indicated her last seizure was last August or September, which was seven to eight months prior. At any rate, her seizure disorder has been considered and factored into the residual functional capacity assessment with the usual seizure precautions of: no climbing ladders, ropes or scaffolds; no balancing; and no working at heights or around dangerous, moving machinery.

State Agency review physicians concluded that the claimant could perform light work (Exhibit 8F) with only occasional climbing ramps stairs, balancing, stooping, kneeling, crouching and crawling. The claimant cannot climb ladders, ropes or scaffolds. The usual seizure precautions apply of no working at heights or around, dangerous moving machinery.

In the record, the claimant complained of carpal tunnel syndrome. On physical examination, the hands revealed no muscle atrophy and she had "fairly" good sensation and negative Tinel's and Phalen's signs (Exhibit 9F, p. 6). Even though the claimant complained of left arm numbness, tingling and weakness, neurological examination on December 7, 2006 was normal with no loss of function in any extremities and no loss of sensation (Exhibit 10F, p. 3). As previously noted, at the neurological consultative examination, grip strength was 60/60/55 pounds of force with the right hand and 45/55/55 with the left hand. At the consultative examination, grip strength was She also complained of temporary loss of vision in the right eye (Exhibit 10F, p. 15). However, the neurological and eye examination were both normal and there was no sign of retinal atrophy or vein occlusion (Exhibit 10F, p. 16). A CT of the head dated July 3, 2006 was normal (Exhibit 10F, p. 26).

The claimant is obese at 66" tall and 209 pounds (Exhibit 10F) with a BMI of 34, according to the medical expert. Obesity is a risk factor and the effect it has on total body function must be considered (Social Security Ruling 02-1p). Undoubtedly, the obesity aggravates her overall

Jolene Marie Heacock███████████

condition and mobility but there is no evidence that it is causing a disabling musculoskeletal or cardiovascular impairment. The claimant's obesity was considered and factored into the residual functional capacity assessment for a narrowed range of light work and for only standing and/or walking for 2 hours out of an 8-hour period.

With regard to her mental status, the claimant was hospitalized at Arrowhead Regional Medical Center from September 29, 2005 to October 3, 2005 for major depression, recurrent with psychosis and amphetamine abuse (Exhibit 1F). She was brought in by security from the medical floor for psychiatric evaluation. She was noted to have been seen by a psychiatrist for increasing depression, helplessness, hopelessness, worthlessness, not sleeping, decreasing energy, negative thoughts, and unable to provide basic care. Upon arrival to behavioral health, the claimant was anxious, nervous, labile, inappropriate, laughing, crying, and admitted to increased feelings of depression, worthlessness, sense of failure, difficulty focusing, difficulty controlling her depression and anxiety, and unable to make a realistic plan for herself. The claimant was placed on Klonopin and Lexapro to control anxiety. She was then admitted for inpatient evaluation. She was stabilized with medication and discharged. After the hospitalization, she was seen at San Bernardino County Department of Behavioral Health in October 2005 (Exhibit 2F). On the initial intake, mental status examination found the claimant oriented in all four spheres. She complained of rapid, racing thoughts and problems with her memory since the stroke. She reported auditory hallucinations and insight and judgment were poor (Exhibit 2F, p. 6). She was noted to have a history of methamphetamine abuse for 35 years and had last used eight weeks prior (Exhibit 2F, p. 3). The claimant was given a diagnosis of depression and amphetamine dependence in early remission. The record is devoid of any further treatment from this facility.

The claimant underwent a psychological consultative examination on January 31, 2006 (Exhibit 4F). She was cooperative, friendly and exhibited sufficient attention to test materials and attempted to answer all questions she was presented with. Test results were said to be valid. The claimant related a history of "mini strokes" beginning in August of 2005. She also reported one heart attack and a history of seizures. She reported having anxiety, thinking she is going to have another stroke, becoming panicky and experiencing 'jerky' movements, fear, tachycardia, and increased respiration. She also reported depression, having word finding difficulty, problems with people's names, misplacing things, becoming sidetracked and social anxiety (e.g. feeling people are looking at her). She reported heavy methamphetamine use for approximately 25 years but had not used since September. The Wechsler Adult Intelligence Scale-Revised (WAIS-R) was administered and the claimant scored a verbal IQ of 81, a performance IQ of 73, and a full scale IQ of 75, indicating intellectual functioning in the borderline range of intelligence. According to the psychological evaluation and testing, the examiner concluded that the claimant had mild cognitive deficits. She is experiencing an adjustment disorder as well, which is most likely the result of her health problems. However, the examiner concluded that the claimant's ability to understand, remember, and carry out simple instructions was only mildly impaired. She was experiencing mild to moderate difficulties with concentration, persistence, and pace. Her ability to socialize in the workplace would not be impaired. Her ability to tolerate stress was moderately impaired and the claimant was at mild risk for emotional breakdown in the workplace.

See Next Page

Jolene Marie Heacock█████████

State Agency review psychiatrists concluded that the claimant had a severe organic mental impairment, affective disorder, and a history of substance addiction (Exhibit 6F). With regard to the Part B criteria, the claimant would have mild difficulty in activities of daily living and moderate difficulty maintaining social functioning and concentration, persistence, and pace. There are no repeated episodes of decompensation each of extended duration. The claimant could perform simple, repetitive, nonpublic tasks (Exhibit 7F).

Dr. Landau, M.D. and a medical expert, testified after reviewing the entire medical record and hearing the claimant's testimony. Dr. Landau was of the opinion that from August 2005, the claimant has had medically determinable impairments consisting of TIA's and a stroke, which was treated successfully with LICA endarterectomy. She is obese and has a possible seizure disorder versus recurrent TIA's, vs. panic attacks. Dr. Landau was of the opinion that with the claimant's impairments, he would not expect her to miss work. Her central nervous system problems were treated and she is currently not being treated for seizures. The claimant's impairments do not meet or equal Listing level severity. With regard to her residual functional capacity, due to obesity, out of an 8-hour period, the claimant could stand and/or walk for 2 hours and sit for 6 hours with normal breaks such as every 2 hours. She could lift and/or carry 10 pounds frequently and 20 pounds occasionally. She can climb stairs but cannot climb ladders, work at heights, or balance. She cannot operate motorized equipment or work around unprotected machinery.

The medical expert's testimony is considered highly probative. It is consistent with the medical record, is based on objective medical evidence, takes account of the various recommendations, is even more restrictive than the recommendations of the consultative examiner and State Agency review physicians, and accords the claimant every reasonable benefit of the doubt. The undersigned has incorporated Dr. Landau's opinion into the assessed residual functional capacity.

**6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a grocery clerk (Dictionary of Occupational Titles 211.462-014), which was light in exertion and semi-skilled. She also has past relevant work as a waitress (311.477-030), which was light in exertion and semi-skilled. The vocational expert testified that with the residual functional capacity assessed herein, the claimant could not perform any of her past relevant work. Accordingly, I find that the claimant is unable to perform past relevant work.

**7. The claimant was born on July 31, 1956 and was a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

See Next Page

1

Jolene Marie Heacock ███████████                                    Page 11 of 12

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of a representative number of light, unskilled occupations such as: bench assembler (Dictionary of Occupational Titles 706.684-042) (SVP2) eroded 75 percent and leaves 750 jobs in the regional economy and 10,000 in the national economy; office helper (239.567-010) (SVP2), eroded 50 percent, leaving 750 jobs in the regional economy and 12,500 in the national economy.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from August 13, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

See Next Page

1

MAY-01-2008  16:13        SSA MORENO VALLEY CA                    19516562241    P.016

Jolene Marie Heacock                                    Page 12 of 12

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on November 25, 2005, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on November 25, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

Mason D. Harrell, Jr.
Administrative Law Judge

KQL

APR 2 2 2008
Date

19